NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

———————————————————————— )
)
JOHN CROWLEY, as Receiver )
of Ambassador Insurance Company, )
)     Hon. Harold A. Ackerman
      Plaintiff, )
)     CIV. NO. 85-2441 (HAA)
)
      -- vs -- )
)
)     **OPINION**
DORIS JUNE CHAIT, et al., )
)
      Defendants. )
———————————————————————— )

**ACKERMAN, Senior District Judge:**

On July 27, 2005, this Court entered a default judgment against Defendant Estate of Arnold Chait (the "Estate of Chait"). Two days later, a jury returned a verdict awarding damages of $119.9 million to Plaintiff Vermont Commissioner of Insurance ("Plaintiff"). The jury apportioned 60% of the responsibility for those damages to the Estate of Chait, with the remaining 40% apportioned to Defendant PricewaterhouseCoopers LLP ("PwC").

This Court must now decide two outstanding issues. First, the Court must determine whether PwC is jointly and severally liable with the Estate of Chait for the full amount of damages. Second, the Court must determine what amount of prejudgment interest, if any, Plaintiff is entitled to receive. This Opinion will address each issue in turn.

**I.**      **PwC and the Estate of Chait Are Jointly and Severally Liable to Plaintiff**

This Court ruled in August 2004 that New Jersey law would govern the substantive issues

1

in this case.  In 1985, when Plaintiff filed his Complaint, the Comparative Negligence Act, L. 1973, Ch. 146, was in effect in New Jersey.[1]  Codified at N.J.S.A. 2A:15-5.1 to -5.3, that statute provided for comparative negligence and set forth a framework for allocating fault among joint tortfeasors in a negligence action.  Paragraph 5.2(2) provided that the trier of fact must first make a determination as to the total amount of damages recoverable by the injured party.[2] Having made such a determination, the trier of fact must then assign a percentage of fault to each party in the case, with all percentages totaling 100%.[3]  Finally, after such findings of fact have been rendered, the judge must "mold" the total judgment to correspond to such findings of fact.[4] Accordingly, the statute specified the manner by which a so-called "molded verdict" was to be

---

[1]  This statute was superseded in 1987 with the current statutory regime, which permits a party to be held jointly and severally liable only when it is found liable for at least 60% of the total damage award.

[2]

> 2.  In all negligence actions in which the question of liability is in dispute, the trier of fact shall make the following as findings of fact: a.  The amount of damages which would be recoverable by the injured party regardless of any consideration of negligence, that is, the full value of the injured party's damages; . . . .

N.J.S.A. 2A:15-5.2(2)(a) (West 1987).

[3]

> b. The extent, in the form of a percentage, of each party's negligence. The percentage of negligence of each party shall be based on 100% and the total of all percentages of negligence of all the parties to a suit shall be 100%.

N.J.S.A. 2A:15-5.2(2)(b) (West 1987).

[4]

> c.  The judge shall mold the judgment from the finding of fact made by the trier of fact.

N.J.S.A. 2A:15-5.2(2)(c) (West 1987).

reached.

Paragraph 5.3(3) set forth the terms by which an injured party could recover damages from a tortfeasor once a molded verdict had been rendered. It provided that an injured party "may recover the full amount of the molded verdict from any party against whom such recovering party is not [otherwise] barred from recovery." N.J.S.A. 2A:15-5.3(3) (West 1987). Unlike the statute in effect today, the former statute did not qualify the term "any party" by measure of the party's percentage of fault. Thus, the plain language of the former statute permitted recovery of the full amount of the molded verdict from "any party," regardless of that party's percentage of fault. To mitigate the potential injustice of this provision, the statute permitted the party from whom the full judgment was collected to "seek contribution from the other joint tortfeasors" on a pro rata basis. *Id.*

Therefore, under the law in effect at the time the Complaint was filed in this case, joint and several liability applied to parties found to be joint tortfeasors. Under New Jersey law, joint tortfeasors "must either act together in committing the wrong, or their acts, if independent of each other, must unite in a single injury." *Erkins v. Case Power & Equip. Co.*, 164 F.R.D. 31, 33 (D.N.J. 1995). In the latter instance, two or more defendants are joint tortfeasors when, by their independent action, they have created a single, indivisible injury. *See Hill v. Macomber*, 103 N.J. Super. 127, 137, 246 A.2d 731, 737 (App. Div. 1968), *superseded by statute*, L. 1987, Ch. 325. It is not necessary for joint tortfeasors to have committed the same tort. *See Erkins*, 164 F.R.D. at 33 ("New Jersey case law consistently holds that joint tortfeasors may be held liable under different theories of recovery.") (citing cases).

Under Plaintiff's theory of his case, Arnold Chait and Coopers & Lybrand should have

known, in early 1982, that Ambassador Group, Inc. was insolvent, and should have disclosed this fact publicly through accurate financial reporting. Instead, according to Plaintiff, Mr. Chait and Coopers & Lybrand jointly "negotiated" Ambassador's loss reserves so as to conceal the insolvency and create the illusion of a financially sound and growing corporation. As a result, Ambassador remained in business past March 31, 1982, continuing to write highly risky business and incur costs that, ultimately, generated catastrophic losses. The jury's verdict clearly signals its acceptance of this theory. Accordingly, it is apparent that the torts committed by Arnold Chait and Coopers & Lybrand gave rise to a single, indivisible injury to Ambassador and its creditors, shareholders, and claimants. *Compare Cherry Hill Manor Assocs. v. Faugno*, 182 N.J. 64, 73, 861 A.2d 123, 128 (2004) (holding that "separate torts at disparate times with different damages covering a six-year period" did not result in common liability to the tort victim and therefore did not create joint tortfeasorship for contribution purposes), *with LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc.*, 340 N.J. Super. 155, 160-61, 773 A.2d 1209, 1212 (App. Div. 2001) (holding that three independent attorneys in a single real estate transaction who each failed to ensure that a deed and mortgage were filed timely, giving rise to a single injury, were properly held to be joint tortfeasors).

PwC argues, in essence, that Plaintiff has waived his claim to joint and several liability between PwC and the Estate. Specifically, PwC claims that the Complaint merely seeks to hold the other three named individual Defendants—Arnold Chait, Doris Chait, and Richard Tafro—jointly and severally liable, and never asserts that PwC should be held jointly and severally liable with any other Defendant. Indeed, PwC contends that throughout the course of this litigation, Plaintiff has maintained a distinction between the damages he sought from PwC

and those he sought from the other named defendants. Plaintiff addressed this argument in his

trial brief. There, Plaintiff noted that in both the original Answer (filed on September 18, 1985)

and the Amended Answer (filed on December 16, 1985), PwC raised the affirmative defense that

damages "should be apportioned among those responsible therefor in proportion to their relative

fault." (Pl.'s Trial Br. 5.) Plaintiff argued in his trial brief that PwC's affirmative defense is

evidence that the Complaint properly put PwC on notice that it could be subject to joint and

several liability.

   PwC's waiver argument is unavailing. Although it is true that Counts 1 through 4 of the

Complaint are specific to the individual defendants (Arnold Chait, Doris Chait, and Richard

Tafro), whereas Count 5 is specific to PwC, the allegations with respect to PwC are inextricably

intertwined with the conduct of the individual defendants. In Paragraph 41 of the Complaint, the

first paragraph of Count 5, Plaintiff repeats and reavers the allegations contained in the preceding

counts. Paragraph 44.a. then alleges that PwC issued favorable opinions of Ambassador's

financial statements "despite having specific knowledge of management conduct and practices

that should have alerted [PwC] that such statements were materially untrue." Likewise,

Paragraph 44.b. accuses PwC of "ignoring" deficiencies in Ambassador's operations and control

when it performed audits and examinations of Ambassador. Finally, Paragraph 48 states that

Plaintiff seeks to hold PwC liable "to the full extent of Ambassador's insolvency." Plaintiff

made similar statements with respect to the other named defendants, thus lending further support

to the idea that Plaintiff sought to hold all of the defendants jointly and severally liable. These

and other allegations in Count 5 leave little doubt that from the inception of this case, Plaintiff

regarded PwC's negligence, operating in conjunction with the gross negligence and

mismanagement of the other named defendants, as having caused the injury to Ambassador's claimants and creditors.

PwC's Amended Answer, filed on December 19, 1985, belies PwC's claim of surprise. The Eleventh Separate Defense of that pleading states that "[a]ny damages to which plaintiff may be entitled should be apportioned among those responsible therefor in proportion to their relative fault." This defense demonstrates beyond question that PwC was on notice of the possibility that Plaintiff could seek to hold PwC jointly and severally liable for the total damages to Ambassador. Moreover, in the Amended Final Pretrial Order, Plaintiff reiterates, in express terms, that he seeks to hold PwC jointly and severally liable for the total damages to Ambassador. PwC dismisses such statements as an "afterthought." For the reasons already discussed, however, this Court disagrees.

Accordingly, the Court finds that PwC and the Estate of Chait are joint tortfeasors, and that both are jointly and severally liable for the entire amount of the $119.9 million molded verdict.

## II.     Plaintiff Is Entitled to $63.0 Million in Prejudgment Interest

A federal court sitting in diversity must look to state law in determining whether to award prejudgment interest. *W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215, 219 (3d Cir. 1984). "Under New Jersey law, a court may award prejudgment interest in its discretion in accordance with equitable principles, and the court's exercise of its discretion should not be disturbed on appeal unless it represents 'a manifest denial of justice.'" *Liberty Lincoln-Mercury v. Ford Motor Co.*, 134 F.3d 557, 574 (3d Cir. 1998). To guide courts' discretion, New Jersey has adopted a general policy favoring awards of prejudgment interest in tort cases. This policy

6

finds expression in New Jersey Court Rule 4:42-11(b), which provides in part as follows:

> Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions, including products liability actions, include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. Prejudgment interest shall not, however, be allowed on any recovery for future economic losses.

N.J. Ct. R. 4:42-11(b). The rule therefore makes prejudgment interest in tort cases automatic, *see DialAmerica Mktg., Inc. v. KeySpan Energy Corp.*, 374 N.J. Super. 502, 509, 865 A.2d 728, 732 (App. Div. 2005), but contemplates an exemption for "exceptional cases."

"Exceptional cases" are identified by reference to the policies underling the prejudgment interest rule. *Wiese v. Dedhia*, 354 N.J. Super. 256, 267, 806 A.2d 826, 833 (App. Div. 2002). The purpose of the rule is not to penalize the judgment debtor, but rather, to remedy the inequity arising from the fact that until judgment is entered and paid, the judgment debtor has enjoyed full use of money rightfully belonging to the judgment creditor. Sylvia B. Pressler, *Current N.J. Court Rules*, R. 4:42-11 cmt. 8 (2006); *see also N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.*, 158 N.J. 561, 574-75, 730 A.2d 843, 851 (1999) (noting the "equitable purpose of prejudgment interest"). Additionally, the prejudgment interest rule serves to promote settlement and remove any incentive for a defendant to delay payment. *See Busik v. Levine*, 63 N.J. 351, 307, 359, A.2d 571, 575-76 (1973). Therefore, in light of these strong policy objectives, exceptions to the prejudgment interest rule should be rare. *See N. Bergen Rex Transp.*, 158 N.J. at 575, 730 A.2d at 851 (noting that the "exceptional cases" exemption in Rule 4:42-11(b) "should be used sparingly"); Pressler, *supra*, R. 4:42-11 cmt. 8 (stating that the exception to Rule 4:42-11(b) "should . . . be most cautiously exercised, and always with consideration of the

underlying purpose and philosophy of the rule; namely that prejudgment interest is not a penalty but is rather a payment for the use of money").  In general, exceptions are appropriate only when the award of prejudgment interest fails to fulfill the policy objectives behind the prejudgment interest rule.  *Mandile v. Clark Material Handling Co.*, 303 F. Supp. 2d 531, 537 (D.N.J. 2004) ("Under the New Jersey prejudgment interest rule, the judicial suspension of interest extends only to those cases where an award of interest would neither advance the aim of early settlement nor constitute fair compensation to plaintiff for money withheld and used or presumptively used by defendant.") (internal quotation marks omitted).

Some courts of this state have noted an exception to the prejudgment interest rule where the plaintiff is responsible for creating inordinate trial delay.  *See, e.g.*, *Espin v. Allergan Pharm., Inc.*, 127 N.J. Super. 496, 497, 317 A.2d 779, 780 (Law Div. 1973).  When viewing the 20-year history of this litigation, it is impossible to deny that there has been significant delay.  The Court declines, however, to assign blame for the delay to any party in this litigation.  Moreover, as prejudgment interest is not a penalty, the Court joins those commentators who criticize any award or denial of prejudgment interest premised solely on the litigation conduct of the parties. *See* Pressler, *supra*, R. 4:42-11 cmt. 8 (criticizing *Espin* for failing to take heed of the rationales underlying the prejudgment interest rule).

Certain courts have exercised their discretion to suspend prejudgment interest during court-ordered stays of litigation.  *See, e.g.*, *Dall'Ava v. H.W. Porter Co.*, 199 N.J. Super. 127, 129, 488 A.2d 1036, 1036 (App. Div. 1985) (affirming trial court's decision to suspend prejudgment interest during a court-ordered stay following defendant's filing of bankruptcy petition).  In this vein, PwC requests that this Court suspend prejudgment interest for the period

of time in which this case was transferred to the Eastern District of New York for multidistrict

litigation.  Full consideration of the historical scope of this litigation, however, persuades this

Court that the equities do not favor suspending prejudgment interest for the period that this case

was in multidistrict litigation.  *Cf. Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F.

Supp. 2d 394, 404 (D.N.J. 2000) (noting the "equitable underpinnings of the 'exceptional

circumstance' doctrine" and declining to order suspension of prejudgment interest at summary

judgment stage).

PwC correctly notes that the purpose of the prejudgment interest rule is to make the

plaintiff whole.  Courts of this state have recognized that an important consideration of making a

plaintiff whole is the award of prejudgment interest.  *See Bailey v. Pocaro & Pocaro*, 305 N.J.

Super. 1, 8, 701 A.2d 916, 920 (App. Div. 1997) (noting that the award of prejudgment interest

in malpractice cases "should be guided by equitable principles with the concept of making the

victim whole of paramount significance"); *Osborne v. O'Reilly*, 267 N.J. Super. 329, 332, 631

A.2d 577, 579 (Law Div. 1993) (including prejudgment interest on underlying claim in

calculating damages required to make malpractice plaintiff whole).  Consistent with that

objective, Rule 4:42-11(b) does not permit prejudgment interest to be awarded on future

economic losses.  As a consequence of this recent amendment to the rule, "the jury will have to

return, by special interrogatory, discrete verdicts for past economic damages, future economic

damages, and a single lump sum for non-economic damages."  Pressler, *supra*, R. 4:42-11 cmt.

8; *see also 2002 Report of the Supreme Court Civil Practice Committee* app. C, at 2 (Jan. 15,

2002) (noting that the proposal to bar prejudgment interest on future economic losses would

require the jury to make discrete determinations as to past and future damages).  Because future

9

economic damages are included as a component of Plaintiff's damages calculation, PwC argues that Plaintiff should have requested that the jury return, by special interrogatory, discrete verdicts on the separate items of damages.  His failure to do so, PwC argues, precludes Plaintiff from now requesting prejudgment interest.

The provision excluding prejudgment interest on future economic losses was added to Rule 4:42-1 by amendment effective July 1, 2003.  Accordingly, there is very little caselaw interpreting this amendment.  Recently, the New Jersey Appellate Division affirmed a trial court's grant of prejudgment interest on an action under the New Jersey Law Against Discrimination after the jury granted damages to the plaintiff for pain and suffering and past wage loss but denied damages for future wage loss and punitive damages.  *See Potente v. County of Hudson*, 378 N.J. Super. 40, 45, 874 A.2d 580, 583 (App. Div. 2005).  By comparison, in *Mandile v. Clark Material Handling Co.*, 303 F. Supp. 2d 531 (D.N.J. 2004), *aff'd on other grounds*, 131 Fed. App'x 836 (3d Cir. 2005), a judge of this District declined to grant prejudgment interest on a jury's award of damages in favor of one of the plaintiffs because that plaintiff had failed to request discrete verdicts on past and future economic losses, "therefore rendering it impossible to determine whether and to what extent the jury verdict represents future economic loss, non-economic loss, or past economic loss."  *Id.* at 536.[5]  Although scant, this caselaw illustrates the importance of distinguishing past from future economic losses in jury awards following the 2003 amendment to Rule 4:42-11.

---

[5]  The judge did, however, apply prejudgment interest to the jury's award of damages for loss of consortium to another plaintiff, reasoning that the jury's award "could not have been for future economic loss given that her claims were solely for loss of consortium."  *Mandile*, 303 F. Supp. 2d at 536.

There is no dispute that Plaintiff's calculation of damages for wrongful prolongation of corporate life includes a $36.0 million item for "net unpaid claims" and a $20.9 million item for "assumed claims payable to Horizon," both of which represent future economic losses. (*See* Mem. in Supp. of Pl.'s Proposed Form of J. 14-15.) The jury's verdict, however, does not include the combined $56.9 million future loss component. Rather, Plaintiff reduced the $56.9 million figure to present value, which entailed subtracting $2.4 million. Accordingly, the jury's verdict reflects this adjusted $54.5 million future loss component. To remove all future economic losses from the verdict for purposes of calculating prejudgment interest, Plaintiff proposes simply to strike $54.5 million from total damages before applying prejudgment interest.

It is axiomatic that damages, as an element of a tort, must be found by the trier of fact. *See* N.J.S.A. 2A:15-5.2(2) and (2)(a) (West 1987) ("In all negligence actions in which the question of liability is in dispute, the trier of fact shall make the following findings of fact: a. The amount of damages which would be recoverable by the injured party. . . ."). Moreover, as discussed above, the New Jersey Court Rules contemplate that the jury must return discrete verdicts as to past and future economic losses. *See* Pressler, *supra*, R. 4:42-11 cmt. 2. Where the jury returns a verdict representing the total amount of damages prayed for by the plaintiff, however, it is apparent that the jury has found that the plaintiff has proven each item of his or her damages calculation. *See Fid. & Cas. Co. v. Mangum*, 102 Ga. App. 311, 316, 116 S.E.2d 326, 331 (1960) ("The plaintiff's petition as amended sought 4 items of recovery, each item being specified as to amount, but the total shown as being prayed for was not the sum of these 4 items. However, since the jury returned a verdict in the 'total' amount sought it must be concluded that the jury was seeking to return a verdict for the plaintiff as to each item in the full amount

sought."); *cf. Baker v. Charles*, 746 S.W.2d 854, 856 (Tex. App. 1988) (rejecting argument that plaintiff had failed to segregate past and future damages, and examining record to determine the basis for the damage award for purpose of applying prejudgment interest). This is particularly true where, as in the instant case, the jury has considered the detailed breakdown of the plaintiff's damages calculation.

Throughout the lengthy duration of this trial, the jury was repeatedly confronted with characterizations of the items in Plaintiff's damages calculation. That the jury was cognizant of these items is evidenced by the jury's pointed questions to this Court. Counsel is well aware that the jury specifically requested the item-by-item breakdown of Plaintiff's calculation of damages for wrongful prolongation of corporate existence. Little more than an hour after receiving this information, the jury returned a verdict for the full amount of damages Plaintiff sought. This cannot be mere coincidence. These circumstances demonstrate, in this Court's view, the jury's acceptance of each item of damages presented in Plaintiff's damages calculation.

PwC argues that no testimony was elicited at trial that expressly characterized the $36.0 million and $20.9 million items as future economic loss. Accordingly, PwC does not concede that these items, as reduced to present value, represent the total future loss component of Plaintiff's damages calculation. (Form of J. Hr'g Tr. 43:20, Sept. 21, 2005.) The record affords little support for PwC's position. *See Baker*, 746 S.W.2d at 856 (examining the record to determine whether past and future losses are segregated for purposes of applying prejudgment interest). Setting aside, for the moment, the $26.8 million component of damages representing Plaintiff's "hypothetical borrowing" costs, there is no basis for concluding that any item of damages, other than the aforementioned $36.0 million and $20.9 million items, contains future

12

economic losses.  PwC has had ample opportunity to examine each item of Plaintiff's damages calculation at trial, yet is unable to identify any item that contains future economic loss.  (*See* Form of J. Hr'g Tr. 43:23-25, Sept. 21, 2005.)  Having carefully reviewed the record, the Court can do no better.  Therefore, on the basis of the record established at trial, this Court concludes that the aforementioned $54.5 million combined figure represents the total future economic loss component of Plaintiff's damages and must be subtracted from the verdict before prejudgment interest may be calculated.  Unlike the Court in *Mandile*, which found the task of separating past from future economic losses in the jury's general verdict to be "impossible," 303 F. Supp. 2d 531, this Court has little difficulty in identifying the $54.5 million component of the jury's verdict representing future economic loss.

This Court therefore finds no compelling reason why prejudgment interest should not be applied to the verdict rendered in this case.  Accordingly, the Court will apply prejudgment interest pursuant to Rule 4:42-11(b), but only after subtracting all elements of damages representing future economic loss.  The Court declines to exercise its discretion to find that this litigation, or any period therein, qualifies as an "exceptional case" warranting the suspension of the prejudgment interest rule.[6]

---

[6] PwC argues that because interest is already embedded in the verdict, applying prejudgment interest to the verdict would cause Plaintiff to receive a windfall.  Accordingly, PwC urges this Court to exercise its discretion to deny any further prejudgment interest, citing *Chattin v. Cape May Greene Inc.*, 216 N.J. Super. 618, 644, 524 A.2d 841, 854 (App. Div. 1987).  In that case, the Appellate Division affirmed the trial court's denial of prejudgment interest after the jury, in a colloquy with the trial judge, indicated its express intention to include prejudgment interest in the verdict.  As no such intention has been expressed in the instant case, the Court finds *Chattin* to be of limited persuasive authority.  Accordingly, the Court declines to exercise its discretion to find that this case qualifies as "exceptional" for purposes of suspending the prejudgment interest rule.

The parties dispute whether an additional $26.8 million must be subtracted from the verdict before prejudgment interest may be calculated.  This $26.8 million item represents a hypothetical interest expense that Ambassador would have incurred in borrowing sufficient funds to pay claims and operating expenses as they came due.  (Trial Tr. vol. 19, 27, May 31, 2005.)[7]  However, on business that it wrote after March 31, 1982, Ambassador earned $80.9 million in premiums.  Plaintiff's damages expert estimated at trial that Ambassador could have earned $14.2 million in interest on these premiums (Trial Tr. vol. 21, 38:13-15, June 2, 2005), thereby offsetting a portion of Ambassador's hypothetical interest expense.  Accordingly, Ambassador incurred a "net interest expense" of $12.6 million.  (Pl.'s Demonstrative Ex. 362.)[8]

In his brief in support of his proposed form of judgment, Plaintiff characterizes the $26.8 million "hypothetical borrowing" expense as "essentially a form of prejudgment interest."  (Pl.'s Br. 15.)  Plaintiff would not, however, subtract this item from the $65.4 million base figure from which prejudgment interest is to be calculated.  Rather, Plaintiff would calculate prejudgment interest on $65.4 million (amounting to $93.4 million in interest) and would subtract $26.8

---

[7]  Plaintiff's damages expert, Mr. Loren Kramer, described this item at trial by noting that after March 31, 1982, Ambassador incurred

> $188 million of expenses and only $80 million of revenue.  So obviously there wasn't enough money to pay all of these expenses, and so I concluded that in making a calculation like this for the purposes of identifying damages to the company that there should be an interest expense factor to recognize the cost to the company of not being able to pay all of these claims and operating expenses as they come due.  So this is a hypothetical interest expense on a hypothetical loan to effectively borrow money to pay these expenses.

(Trial Tr. vol. 19, 27:10-20, May 31, 2005.)

[8]  As Mr. Kramer testified at trial, "So this [$]12.6 [million] is a net amount; it reflects interest income in the early period of time during this 21-year period, and then when the cash runs out, a hypothetical interest expense."  (Trial Tr. vol. 19, 28:7-10, May 31, 2005.)

million from the interest so as not to "recover twice." (*Id.*) Under this approach, Plaintiff notes, he is actually giving PwC a "windfall" because, in fact, Plaintiff need only subtract the *net* interest expense of $12.6 million from prejudgment interest. (Form of J. Hr'g Tr. 24:2-5, Sept. 21, 2005.)

PwC maintains that if this Court should decide to award prejudgment interest, it should subtract the $26.8 million hypothetical borrowing cost from the $65.4 million base number *before* prejudgment interest is calculated. The Court agrees that prejudgment interest should not be awarded on any hypothetical interest expenses that Ambassador may have incurred, but finds that only the $12.6 million net interest expense that formed a part of the verdict, rather than the $26.8 million gross borrowing expense, should be deducted from the $65.4 million base. First, Rule 4:42-11(b) provides only for the award of "simple interest." In light of Plaintiff's admission that the $26.8 million hypothetical borrowing expense "is essentially a form of prejudgment interest" (Pl.'s Br. 15), and because interest applied to interest is not simple interest, the Court concludes that interest should not be awarded on any part of the $26.8 million figure. As noted already, the only part of the $26.8 million item that appears in the verdict is the $12.6 million net interest expense, so the Court finds that it is necessary to subtract the $12.6 million item of damages from the $65.4 million base figure before calculating prejudgment interest.

The Court further notes that the $12.6 million item represents a "hypothetical" interest expense conceived by Plaintiff's damages expert and designed only to simulate "economic reality." (Form of J. Hr'g Tr. 20:20, Sept. 21, 2005.) Although Plaintiff's estimate may be "reasonable" (*see* Trial Tr. vol. 21, 38:11, June 2, 2005), the undisputed fact remains that Ambassador never actually incurred the $12.6 million item of expense (*id.* at 13:8-11, 37:13-16).

15

Because the Court finds that the policy objectives underlying the prejudgment interest rule would not be strongly served by compensating a plaintiff for a defendant's "hypothetical" use of money, the Court declines to apply prejudgment interest on the $12.6 million item in this instance.

The Court is further perplexed by Plaintiff's offer to subtract the full $26.8 million hypothetical borrowing cost from prejudgment interest (Pl.'s Br. 15; Form of J. Hr'g Tr. 23:23-24:5, Sept. 21, 2005), when in fact only the *net* interest expense of $12.6 million formed a component of the verdict (Pl's Demonstrative Ex. 362). Indeed, Plaintiff's counsel goes so far as to admit that they are offering PwC a "windfall" on Ambassador's estimated $14.2 million interest income. (Form of J. Hr'g Tr. 24:2-5, Sept. 21, 2005). Proffered acts of charity as between such contentious adversaries as occupy this case give the Court pause. This anomaly, in the Court's view, only further underscores the speculative aspect of Plaintiff's "hypothetical borrowing" damages.

Therefore, in the exercise of its discretion, and in accordance with New Jersey Court Rule 4:42-11(b), the Court declines to award prejudgment interest on the $12.6 million net interest expense. To this end, the Court will reduce the previously-calculated $65.4 million base figure by a further $12.6 million. The resulting figure, $52.8 million, will be the new "base" amount of damages to which prejudgment interest shall apply.

Rule 4:42-11(b) provides that prejudgment interest shall run "from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later." This action was commenced on May 21, 1985, more than six months after the cause of action accrued. Therefore, prejudgment interest shall run from May 21, 1985.

The method for calculating prejudgment interest follows that set forth in Rule 4:42-11(a),

16

pertaining to post-judgment interest.  *See* Pressler, *supra*, R. 4:42-11 cmt. 2.  That rule provides as follows:

> Except as otherwise ordered by the court or provided by law, judgments, awards and orders for the payment of money, taxed costs and counsel fees shall bear simple interest as follows:
>
> (i) For periods prior to January 2, 1986, the annual rate of return shall be as heretofore provided by this rule, namely, . . . 12% for the period between September 14, 1981 and January 1, 1986.
>
> (ii) For judgments not exceeding the monetary limit of the Special Civil Part at the time of entry, regardless of the court in which the action was filed: commencing January 2, 1986 and for each calendar year thereafter, the annual rate of interest shall equal the average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year terminating on June 30, of the State of New Jersey Cash Management Fund (State accounts) as reported by the Division of Investment in the Department of the Treasury.
>
> (iii) For judgments exceeding the monetary limit of the Special Civil Part at the time of entry: in the manner provided for in subparagraph (a)(ii) of this Rule until September 1, 1996; thereafter, at the rate provided in subparagraph (a)(ii) plus 2% per annum.

N.J. Ct. R. 4:42-11(a).  The verdict in this case, $119.9 million, exceeds the monetary limit of the Special Civil Part.  *See* N.J. Ct. R. 6:1-2(a)(1).  Accordingly, simple interest shall be applied as follows:

| Year | Principal (000,000) | Rate[9] | Percentage of Year | Accrued Interest (000,000) |
|---|---|---|---|---|
| 5/21/85-12/31/85 | 52.8 | 0.12 | 0.614 | $3.89 |
| 1986 | 52.8 | 0.12 | 1 | $6.34 |
| 1987 | 52.8 | 0.12 | 1 | $6.34 |
| 1988 | 52.8 | 0.06 | 1 | $3.17 |
| 1989 | 52.8 | 0.07 | 1 | $3.70 |
| 1990 | 52.8 | 0.08 | 1 | $4.22 |
| 1991 | 52.8 | 0.085 | 1 | $4.49 |
| 1992 | 52.8 | 0.075 | 1 | $3.96 |
| 1993 | 52.8 | 0.055 | 1 | $2.90 |
| 1994 | 52.8 | 0.035 | 1 | $1.85 |
| 1995 | 52.8 | 0.035 | 1 | $1.85 |
| 1/1/96-9/1/96 | 52.8 | 0.055 | 0.669 | $1.94 |
| 9/2/96-12/31/96 | 52.8 | 0.075 | 0.331 | $1.31 |
| 1997 | 52.8 | 0.075 | 1 | $3.96 |
| 1998 | 52.8 | 0.075 | 1 | $3.96 |
| 1999 | 52.8 | 0.075 | 1 | $3.96 |
| 2000 | 52.8 | 0.07 | 1 | $3.70 |
| 2001 | 52.8 | 0.075 | 1 | $3.96 |
| 2002 | 52.8 | 0.08 | 1 | $4.22 |
| 2003 | 52.8 | 0.05 | 1 | $2.64 |
| 2004 | 52.8 | 0.04 | 1 | $2.11 |
| 2005 | 52.8 | 0.03 | 0.748 | $1.18 |
| | | | | $75.65 |

The foregoing schedule reveals that simple interest on $52.8 million from May 21, 1985 through September 30, 2005, calculated in accordance with New Jersey Court Rules and rounded to three significant digits, is $75.6 million. This figure must therefore be added to the verdict to compensate Plaintiff fully for lost use of money during the pendency of this litigation.

PwC argues that applying prejudgment interest to the entire amount of the verdict is

---

[9] *See* Pressler, *supra*, R. 4:42-11 publisher's note (listing annual interest rates).

18

inappropriate because Ambassador had not actually sustained all of its damages by May 21, 1985. Plaintiff is correct to note, however, that while not every policy written after March 31, 1982 had resulted in a claim being filed by May 21, 1985, those losses were nevertheless "actuarial," or anticipated at the time the Complaint was filed. (Form of J. Hr'g Tr. 26:2-27:2, Sept. 21, 2005). By the passage of time, many of these claims merely converted from "actuarial" to incurred losses. The Court therefore agrees with Plaintiff that PwC's objection to the application of prejudgment interest on the full amount of damages running from May 21, 1985 until present is misplaced.

As a final adjustment to the judgment, PwC asks this Court to subtract, for a second time, the aforementioned $26.8 million hypothetical borrowing cost. Whereas PwC in the first instance asked the Court to subtract $26.8 million from the "base" figure to which interest is applied, PwC further requests that the Court also subtract $26.8 million from prejudgment interest. As noted above, the $26.8 million item represents Plaintiff's estimate of Ambassador's hypothetical interest expense in borrowing funds sufficient to pay claims and expenses as they came due. It does *not* appear in Plaintiff's damages calculation. Rather, only a *net* interest expense of $12.6 million, reflecting a deduction of the estimated interest earned on the $80.9 million in premiums that Ambassador received, forms a component of damages. Therefore, even if this Court were inclined to subtract all elements of interest in the jury's verdict from the prejudgment interest as calculated above, it makes little sense to subtract the $26.8 million gross figure in lieu of the $12.6 million net figure when only the latter appeared in the verdict. (*See* Trial Tr. vol. 19, 28:7-10, May 31, 2005.) That Plaintiff strangely suggests subtracting $26.8 million from prejudgment interest so as to accord PwC a "windfall" no doubt influenced PwC's

19

identical request.

The Court must therefore decide whether to subtract the $12.6 million net interest expense from prejudgment interest.  Under this approach, the $12.6 million item would be entirely expunged from the judgment awarded to Plaintiff.  It would not appear in the calculation of prejudgment interest, and it essentially would not appear in the verdict to which interest is added.  In effect, this approach would treat the $12.6 million item as having never been found by the jury.  While, for this reason, the Court is tempted not to subtract the $12.6 million net interest expense from prejudgment interest, failing to subtract the $12.6 million would result in a higher award of prejudgment interest than even Plaintiff seeks.  The Court is unwilling to bring about such a result.  Therefore, as Plaintiff himself is willing to subtract as much as $26.8 million from prejudgment interest, and because PwC understandably has echoed this request, the Court feels justified in subtracting the $12.6 million net interest expense so as not to permit Plaintiff, in his own words, to "recover twice."  (Pl.'s Br. 15.)

Consequently, the Court will deduct $12.6 million from prejudgment interest of $75.6 million to yield $63.0 million in prejudgment interest.  This interest amount must be added to a total verdict of $119.9 million.  The combined sum, $182.9 million, will form the total judgment in this case.  On that sum, post-judgment interest at a rate specified by Rule 4:42-11(a)(iii) shall accrue from the date judgment is entered.  A separate Order shall form the judgment of the Court in this matter.

<u>s/ Harold A. Ackerman, U.S.D.J.</u>

Newark, New Jersey
Dated: Sept. 30, 2005